**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X        03 CV 5773 (NG) (RML)
KEVIN NELSON,

**Plaintiff,**

-against-                                                                    <u>**OPINION AND ORDER**</u>

**SPECIAL AGENT FNU HERNANDEZ and**
**SPECIAL AGENT JOHN CHANG of the United**
**States Department of the Treasury Bureau of**
**Alcohol, Tobacco and Firearms, 241 37th Street,**
**Brooklyn, NY; and DETECTIVE DAVID**
**INTRATOR of the Drug Enforcement**
**Administration Joint Firearms,**

**Defendants.**
----------------------------------------------------------------X

**GERSHON, United States District Judge:**

Plaintiff Kevin Nelson brings this action against defendants Special Agent John Chang and

Detective David Intrator for false arrest, false imprisonment, and negligence.[1]  Specifically, Nelson

asserts First and Fourth Amendments claims pursuant to *Bivens v. Six Unknown Named Agents of*

*the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Defendants now seek summary judgment

on Nelson's claims, both on the merits and, alternatively, on the basis that they are entitled to

---

[1]  Nelson expressly states, in his opposition to the current motion, that he does not oppose
defendant Ismael Hernandez's motion to dismiss or, in the alternative, for summary judgment.  *See*
Pl.'s Mem. at 15.  As this portion of defendants' motion is unopposed, all claims against defendant
Hernandez are dismissed, with prejudice, in their entirety.  In addition, all claims against the United
States are dismissed with prejudice.  While the caption fails to identify the United States as a
defendant, the text of the Amended Complaint raises allegations against the United States pursuant
to the Federal Torts Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* ("FTCA").  However, during a
June 26, 2006 pre-motion conference, Nelson agreed to the dismissal of all claims against the United
States.  *See* Pre-Motion Conference Tr. 8, June 26, 2006.  On oral argument of the motion, Nelson
agreed that there are no claims against the individual defendants under the FTCA for tortious
conduct.  *See* Oral Argument Tr. 21, November 5, 2007.

1

qualified immunity.[2]  For the reasons set forth below, defendants' motion is granted.

## FACTS

Unless otherwise indicated, the following facts are undisputed.  Plaintiff Kevin Nelson, a six foot tall black male, was arrested on June 7, 2002 for possession and distribution of narcotics.  At the time of his arrest, he was 29 years old and weighed approximately 180 pounds.  Defendant John Chang is a Special Agent ("SA") with the Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); he has been a SA since 2001.  Defendant David Intrator is a Detective employed by the Kings County District Attorney's Office and, from 1999 to 2003, was assigned to the ATF Joint Firearms Task Force.  Intrator has worked at the Kings County District Attorney's Office for approximately eighteen years.  During the relevant time period, both defendants were assigned to the investigation of a group of individuals involved in the distribution and sale of firearms and narcotics across state lines.  Among those individuals were Rasheem Jackson and Ronald Stephens.

During the course of the investigation, and through the use of a confidential informant ("CI") and an undercover officer, the defendants learned that an individual identified as "C" participated in the sale and distribution of narcotics.  Defendants first learned of C's involvement during an October 24, 2001 planned operation for the controlled purchase of narcotics from Jackson.  On that afternoon, Jackson instructed the CI to pick up C from a three-story residential building located at 177 Hart Street.  As part of the planned operation, the CI was driving a vehicle supplied by the ATF

---

[2] Defendants style their motion as one to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and, alternatively, for summary judgment, pursuant to Rule 56.  Because the court relies upon facts outside the pleadings in resolving this motion, it treats the motion as one for summary judgment.

which was wired to transmit audio to the surveillance team by radio communications during the course of the operation. The vehicle was also equipped with a hidden video recorder which captured a black and white video of the individuals inside the vehicle.[3]

When Jackson and the CI arrived at 177 Hart Street, C was not present, though afterwards they picked him up at a nearby subway station. C sat in the back seat of the vehicle while the CI drove and Jackson sat in the front passenger seat. C, Jackson, and the CI then drove to Manhattan to a previously designated location to conduct the narcotics transaction. After arriving at that location, at approximately 3:25 p.m., an undercover officer purchased heroin, through the CI, from Jackson and C. The undercover officer met C only on that one occasion, for a couple of minutes. Neither of the defendants was able to get a good look at C despite participating in the operation. Although Intrator was part of the surveillance team following the vehicle containing the CI, Jackson and C, he never directly saw C. Chang, who was assigned to the undercover officer to keep him away from the buy location until the undercover received word to conduct the transaction, was not part of the surveillance team that followed the CI.

After the transaction was completed, ATF officers weighed the narcotics purchased from C and Jackson and discovered that C and Jackson had sold the undercover only 12.1 grams of heroin rather than the agreed upon twenty grams. Later that evening, at approximately 10:50 p.m., the CI

---

[3] The precise length of the recording produced during the operation is unclear. Chang describes the videotape as either 45 or 90 minutes in length, while Intrator remembers it containing several hours of footage. Both defendants, however, report that the tape stopped recording during the operation. In fact, Chang believes that the tape ran out before the actual narcotics transaction could be recorded. In addition, both defendants commented on the quality of the videotape: Chang recalls that, although the quality of the tape was "okay," it did not clearly record C, who was sitting in the back seat of the vehicle; Intrator described that the sun affected the visual on the black and white videotape.

purchased seven additional grams of heroin from Jackson and C in front of 177 Hart Street to complete the earlier transaction. According to the CI, C exited the premises at 177 Hart Street, handed the CI a plastic bag containing heroin and accepted cash from the CI in return. Members of the ATF conducted surveillance of the CI's purchase of the additional seven grams of heroin, with Chang positioned approximately two blocks away from 177 Hart Street. Intrator was not present, nor was he a part of the surveillance team for the evening operation.

Following the October 24, 2001 transactions, the CI reported that C lived at 177 Hart Street. The CI informed ATF officers that Jackson and C were operating a heroin business and that, on a daily basis, the CI would pick up Jackson in the CI's vehicle and then proceed to 177 Hart Street to pick up C and bundles of heroin for delivery. The CI further informed law enforcement officers that they (he, Jackson and C) would stop by 177 Hart Street before each trip to restock on bundles of heroin. Afterwards, defendants attempted, through various means of investigation, to learn the identity of C. For example, in January 2002, Chang conducted surveillance of 177 Hart Street but was unsuccessful in his attempts to observe Jackson or others engaging in criminal activity.

In February 2002, Stephens and Jackson were each arrested pursuant to a federal arrest warrant issued from the United States District Court, Southern District of New York, for their alleged involvement in a conspiracy to sell firearms without a license and, with regard to Jackson only, conspiracy to sell narcotics. On April 9, 2002, a Superceding Indictment was issued against Stephens, Jackson, David Matthews, Porchetta Lee, Comeshia Ellison and the individual identified as C, wherein C was charged with possession and distribution of narcotics in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C). Stephens, Jackson and the three other named individuals eventually pled guilty in the underlying criminal action.

In an attempt to identify the individual referred to as C, Chang, Intrator and an Assistant U.S. Attorney from the U.S. Attorney's Office, Southern District of New York, questioned Stephens during a May 16, 2002 proffer session. During the session, Stephens provided the following information: C lived on Hart Street; he used to live or had family that lived in Queens; he was a good friend of Jackson's; Jackson met C while incarcerated; and C's name might be Curtis. Stephens further reported that he had met C in person. After the session, Stephens refused to cooperate and no additional proffer sessions were held.

On May 22, 2002, an auto track check was conducted on 177 Hart Street, which revealed that a person named Kurtis Vincent resided at that location. Chang and Intrator then interviewed Vincent at his place of employment. The officers discounted Vincent as C because Vincent was Hispanic and C was black. Vincent informed the officers that two other males, J.J. and Kevin (last names unknown), lived at 177 Hart Street. The officers also discounted J.J. as C because J.J. was too young to fit the description of C. Vincent further informed the officers that Kevin had family in Queens County, New York.

On June 4, 2002, in an attempt to identify C, Chang and Intrator visited the residence at 177 Hart Street. Chang and Intrator attempted to speak with Nelson, who was present at 177 Hart Street but proved uncooperative and refused to allow the officers to thoroughly examine his identification, a New York State driver's license. Chang and Intrator did, however, see that Nelson's license revealed a Rosedale, Queens address. The interaction with Nelson lasted only a couple of minutes. After unsuccessfully attempting to speak with Nelson, Chang and Intrator conducted surveillance of the premises and observed Nelson exit the building located at 177 Hart Street and get into a Jeep bearing New York license plate number BKK-3322. A DMV check revealed that Nelson's vehicle

was registered to Kevin Nelson at 130-57 236th Street, Rosedale, Queens. A criminal history check further revealed that Nelson was a convicted felon and was currently on supervised parole.

As a result of Nelson's conviction, defendants were able to obtain a photograph of Nelson from the High Intensity Drug Trafficking Area ("HIDTA") photo system. On June 5, 2002, Intrator and Hernandez met with the CI to present a photo array to him. The CI informed Intrator and Hernandez that he had met with C eleven times and that he had last seen C the previous month, in May 2002. The CI was shown the photo array, and he identified Nelson as the individual referred to as C. The CI was then shown another photo of Nelson; the CI confirmed that Nelson was C. Intrator relayed this information to Chang, who was not present for the photo array.

On June 7, 2002, Nelson was arrested at 177 Hart Street pursuant to a federal arrest warrant for C, issued by the United States District Court for the Southern District of New York, and the April 9, 2002 Superceding Indictment charging C with possession and the distribution of narcotics. Chang and Intrator were members of the arrest team.

Subsequent to his arrest, Nelson was incarcerated in the Metropolitan Correctional Center ("MCC") from June 7, 2002 through September 30, 2002, when the criminal charges against him were dismissed. While incarcerated, Nelson notified the U.S. Attorney's Office for the Southern District of New York that he had an alibi for October 24, 2001. He claimed that he was working for L. Richards Plumbing & Heating from 7:00 a.m. to 3:30 p.m.[4] Intrator was informed by the U.S. Attorney's Office for the Southern District of New York of Nelson's alleged alibi.

---

[4] Specifically, Nelson claimed that, on October 24, 2001, he was working at a home in New Rochelle, New York, with another "guy" named Michael. Nelson further claimed that Pam LaMond, a nanny at the residence, was present the entire time. According to Nelson, he finished the job at 3:30 p.m., commuted back to the store for approximately an hour and a half, and stayed at the store for one hour before heading to his home in Rosedale, Queens.

On September 5, 2002, Chang and Intrator visited Nelson's employer, L. Richards Plumbing and Heating, to obtain Nelson's employment records and time sheet information for October 24, 2001. Chang and Intrator found the following: the original timesheets for the week ending October 24, 2001 had been altered with respect to the number of hours Nelson worked that week; the sign in/out sheets prior to October 24, 2001 were missing; the sign in/out sheet for October 24, 2001 did not indicate times of arrival or departure; and no information for "Michael," the individual who allegedly worked with Nelson on October 24, 2001, was available and no one at the business could supply Michael's last name. On September 6, 2002, Chang and Intrator interviewed Len Richards, the owner of the business, who informed the officers that Nelson was an unreliable employee who took days off without notifying anyone. Richards also stated that no one at the company could be sure of when Nelson may have worked on October 24, 2001 because of the business's inaccurate record keeping system.

Chang and Intrator subsequently visited a home in New Rochelle, New York, in which Nelson claimed to have been working on October 24, 2001. Chang and Intrator questioned a woman at the residence, who explained that Nelson was at the home on October 24, 2001, but that she could not remember when Nelson arrived or when he left. Richards confirmed that Nelson participated in work on a boiler in the New Rochelle residence on that date, but was unable to determine the time that Nelson arrived or left the premises.

On September 30, 2002, the CI was shown a second photo array. During the array the CI identified an individual named Claude English as C, and stated that he made a mistake when shown the first photo array. On September 30, 2002, the Assistant U.S. Attorney submitted a motion to the court recommending an order of *nolle prosequi* be filed as to Nelson; the recommendation was

accepted, and all charges against Nelson were dismissed.

## DISCUSSION

## I. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts;" indeed, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Id*. at 586-87 (internal quotation marks omitted). Mere conjecture and speculation as to the true nature of the facts will not suffice to overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Neither will immaterial factual disputes. *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[T]he mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment.").

Although the moving defendant bears the burden of showing that no genuine factual dispute exists, the non-moving plaintiff must make a sufficient showing on the essential elements of his case for which he bears the burden of proof at trial. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884

(1990); *Celotex*, 477 U.S. at 323. "Where no such showing is made, the moving party is entitled to judgment as a matter of law . . . ." *Lujan*, 497 U.S. at 884 (internal quotation marks and alterations omitted).

## II.    *Bivens* Action

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized a claim against federal officials, in their individual capacities, for conduct violating the United States Constitution. To maintain a *Bivens* action, a plaintiff must allege a violation by a federal official of a clearly established constitutional right for which the federal official does not have immunity. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Here, Nelson asserts a constitutional claim under the Fourth Amendment for false arrest and false imprisonment against Chang and Intrator.[5] He also asserts an unspecified claim under the First Amendment.

### A.    Fourth Amendment:  False Arrest

Under common law, false arrest is considered a species of false imprisonment, and the two claims have identical elements.[6] *See Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (describing false arrest as a "species of false imprisonment"); *see also Covington v. City of New York*, 171 F.3d 117, 125 (2d Cir. 1999) (Glasser, J., dissenting) (false arrest synonymous with false imprisonment). A false arrest claim rests on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause. *Weyant*, 101 F.3d at 852. To prove

---

[5] The Amended Complaint can be read to assert an additional Fourth Amendment claim: that, even if the court finds that Nelson's arrest was valid, Nelson was subsequently detained for an unreasonably long period of time in violation of his Fourth Amendment right to be free from unreasonable seizures. That claim will be addressed below, *infra* section II.B.

[6] Plaintiff's claims for false arrest and false imprisonment will be referred to simply as a false arrest claim.

the elements of false arrest, a plaintiff must show that: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). In the instant action, only the fourth element is in dispute.

The existence of probable cause is a "complete defense to an action for false arrest," even where the plaintiff is ultimately acquitted of the criminal charges. *Id.* The burden of establishing the absence of probable cause rests on the plaintiff. *Brown v. City of New York*, 306 F.Supp.2d 473, 479 (S.D.N.Y. 2004); *Campbell v. Giuliani*, No. 99-2603, 2000 WL 194815, *5 (E.D.N.Y., Feb. 16, 2000) ("In the context of § 1983," federal courts "have held that the plaintiff bears the burden of establishing the absence of probable cause") (citing *Weyant*, 101 F.3d at 852).

Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (internal quotation marks omitted). The existence of probable cause may be determined "as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852 (citation omitted). In evaluating these matters, courts "consider the facts available to the officer at the time of arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Moreover, the validity of an arrest does not depend on an ultimate finding of guilt or innocence. *Pierson v. Ray*, 386 U.S. 547, 555 (1967). "Rather, the soundness of the arrest hinges on the existence of probable cause at the time the arrest was made." *Dukes v. City of New York*, 879 F. Supp. 335, 340 (S.D.N.Y. 1995). "The quanta of proof necessary to establish probable cause is only the probability, and not the prima facie showing, of criminal activity." *United States v.*

*Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal quotation marks omitted).

"Once a police officer has a reasonable basis for believing that there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128 (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). Indeed, "[t]he constitution does not guarantee that only the guilty will be arrested." *Baker,* 443 U.S. at 145. "[P]robable cause can also exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard*, 25 F.3d at 102. The officer need only have reasonable cause to believe that the arrestee was committing or had committed a crime. *Id.*

Considering the facts in the light most favorable to Nelson, defendants Chang and Intrator had probable cause to arrest him. Through defendants' investigation of Jackson and Stephens, they learned of C's participation in criminal activity. Specifically, on October 24, 2001, defendants observed C engaging in two narcotics transactions, where the undercover purchased heroin from C in the afternoon, and the CI purchased heroin from C in the evening. Moreover, in furtherance of, and throughout, this investigation, the officers received information from the CI that Jackson and C were operating a heroin business. Accordingly, Chang and Intrator reasonably believed that C had committed a criminal offense. *See Singer*, 63 F.3d at 119.

Chang and Intrator were also reasonable in their belief that Nelson was C. During the events of October 24, 2001, C was twice connected to the premises located at 177 Hart Street. First, during the afternoon, Jackson instructed the CI to pick C up from 177 Hart Street. Second, during the evening, C exited the premises at 177 Hart Street and engaged in a narcotics transaction. Following the October 24, 2001 transactions, the defendants learned additional information connecting C to

177 Hart Street. Specifically, the CI reported that: C lived at 177 Hart Street; Jackson and the CI would, on a daily basis, pick up C at 177 Hart Street to collect bundles of heroin for delivery; and Jackson, the CI and C would periodically stop by 177 Hart Street to restock on bundles of heroin. In addition, during a May 16, 2002 proffer session with Stephens, the defendants were informed that C lived on Hart Street.

Through various means of investigation, defendants subsequently learned that Nelson had a connection to 177 Hart Street. On June 4, 2002, in an attempt to identify C, defendants visited the residence at 177 Hart Street. Nelson was present and met the physical characteristics of C. The following day, defendants placed a photograph of Nelson in a photo array which they presented to the CI. The CI identified Nelson as the individual referred to as C. The CI informed Intrator that he had met with C eleven times and that he had last seen C the previous month, in May 2002. After being shown another photo of Nelson, the CI confirmed that Nelson was C. Based on these facts, defendants had probable cause to arrest Nelson. Nelson fit the description of C and was picked out of a photo array and identified as C. Thus, defendants reasonably concluded that Nelson had committed the subject criminal offenses.[7]

Nelson, however, contends that defendants should not have relied on the information and identification supplied by the CI and that defendants' failure to engage in other, specific investigative techniques undermines the existence of probable cause. Specifically, Nelson argues that probable cause was lacking because defendants failed to: (1) show the photo array to the

---

[7] Nelson argues that the warrant for his arrest was defective because it was issued against "C" and not against "Kevin Nelson." Whether or not the warrant was defective, however, defendants had probable cause to arrest Nelson at the time they effectuated his arrest, and probable cause is a "complete defense to an action for false arrest." *Bernard*, 25 F.3d at 102.

undercover agent for identification of C; (2) show the photo array to Stephens for identification of C; (3) compare the video images and audio sounds captured of C with Nelson's appearance and voice; and (4) investigate Nelson's alibi.[8]

As an initial matter, it was entirely appropriate for defendants to rely on the CI's identification of Nelson in concluding they had probable cause to arrest him. "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F. 2d 69, 72 (2d Cir. 1993). Courts, however, have "never required that informants used by the police be infallible." *Illinois v. Gates*, 462 U.S. 213, 246 (1983). In assessing the reliability of the information provided by a confidential informant, courts must consider the "totality of the circumstances." *Id*. It is reasonable to believe that an informant who has provided reliable information in the past will be reliable in the present. *See Wagner*, 989 F.3d at 72-73 ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information."). Additionally, information provided by first hand observation is considered more reliable than information obtained second hand. *Id*. at 73. "An informant's participation in supervised drug purchases is powerful corroborative evidence for the purposes of determining probable cause." *Id*. Even where doubt as to an informant's motives exists, therefore, "his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234.

---

[8] In his motion papers, Nelson sets forth several other specific investigative steps in which, he claims, defendants unlawfully failed to engage. His arguments with regard to these additional investigative steps do not merit discussion.

Finally, information provided by a named informant is generally considered more reliable than information provided by an "anonymous tipster." *See United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000). If an informant's information has been "corroborated in material respects, the entire account may be credited, including parts without corroboration." *Canfield*, 212 F.3d at 720. Even when making a warrantless arrest, a law enforcement officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Gates*, 462 U.S. at 242 (citation omitted).

Considering the totality of circumstances here, defendants were reasonable in finding the CI's identification of Nelson to be reliable. Throughout the course of the investigation, the CI provided consistent and reliable information regarding the subjects of the investigation and their criminal activity. For example, the CI worked with ATF agents in arranging, and participating in, firearms and narcotics purchases with Jackson and C. In addition, various leads gained from information provided by the CI led to the arrest and successful prosecution of all the subjects of the investigation, except C, all of whose identities were unknown at the inception of the investigation. Furthermore, defendants had no reason to question the CI's ability to identify C, given the CI's familiarity with him. When showing the CI the photo array, the CI stated that he had observed C eleven times, the last time being in May 2002, at most one month before the June 2002 positive identification. The CI also reported that he had driven in a vehicle with C for extensive periods of time on a daily basis. In sum, the CI's positive identification of Nelson as C, in conjunction with the investigation as a whole, was sufficient to establish probable cause to arrest Nelson.

Contrary to Nelson's arguments, the defendants were under no obligation to further confirm

the CI's identification by showing the photo array to either the undercover officer or Stephens. Defendants had already obtained probable cause to arrest Nelson. "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989). Furthermore, it was reasonable that defendants did not seek out identification of C from either the undercover officer or Stephens. First, the undercover officer had limited exposure to C. Unlike the CI, the undercover officer met C on only one occasion for a couple of minutes, approximately eight months before the photo array. Second, defendants were prohibited from questioning Stephens after the CI made his identification, as Stephens had previously ceased cooperating with the government.

Nelson's argument that defendants should have consulted the video images and audio sounds captured of C *after* the CI identified Nelson suffers from the same defects. The CI's identification provided defendants with probable cause to make the arrest; they were under no obligation to bolster their already reasonable belief that Nelson had committed a crime. *See id.* Additionally, it is not unreasonable that defendants forewent a second review of the video after the CI identified Nelson. Defendants had reviewed the videotape as part of their investigation, albeit before they had identified Nelson as a suspect, and they had determined that C was not clearly visible. Indeed, C was seated in the back of the subject vehicle, and the videotape's clarity was affected by the sun. That defendants did not review it a second time does not vitiate probable cause.

Nelson's final argument – that defendants' failure to investigate his alibi negates probable cause – is, likewise, without merit. "Probable cause for an arrest must be determined on the basis

of the information reasonably available to the arresting officer *at the time of the arrest*." *Rhodes v. City of Plattsburgh*, 213 F.3d 626 (2d Cir. 2000) (table) (emphasis added). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128. Even if a plaintiff "can establish that an investigation might have cast doubt upon the basis of his arrest, probable cause can still be established." *Oblio v. City University of New York*, No. 01-5118, 2003 WL 1809471 at * 8 (April 7, 2003 E.D.N.Y.). The "arresting officer does not have to prove plaintiff's version wrong before arresting him; [n]or does it matter that an investigation might have cast doubt upon the basis of the arrest." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (internal citations omitted).

Here, defendants were informed of Nelson's alleged alibi *after* his arrest. Accordingly, it has no bearing on whether defendants had obtained probable cause to make the arrest on the date in question. Even had defendants learned of Nelson's alibi defense before or at the time of arrest, however, they were under no obligation to investigate it; indeed, any failure to do so would not have vitiated the existence of probable cause. *See Ricciuti*, 124 F.3d at 128. Nevertheless, defendants did investigate Nelson's alleged alibi and reasonably determined that it did not account for Nelson's whereabouts on October 24, 2001. Specifically, on September 5, 2002, defendants visited Nelson's employer, L. Richards Plumbing and Heating, to obtain Nelson's employment records and time sheet information for October 24, 2001. Defendants found that Nelson's timesheets were either missing or altered. Further, no information for "Michael," the individual who allegedly worked with Nelson on October 24, 2001, was available. In fact, no one at the business could even supply Michael's last name. The following day, defendants learned from the owner of the business that (1) Nelson was

an unreliable employee who took days off without notifying anyone and (2) no one at the company could be sure of when Nelson may have worked on October 24, 2001 because of their inaccurate record keeping system. In addition, defendants traveled to the New Rochelle residence in which Nelson claims to have worked on October 24, 2001. No one at the residence was able to recall when Nelson may have worked on that date. Thus, defendants' investigation into Nelson's alleged alibi did not support his claim that he was working at the time of the October 24, 2001 controlled operation.

In light of the foregoing, I find that defendants had probable cause to arrest Nelson on June 7, 2002. I further find that defendants' "failure" to engage in specific investigative techniques did not undermine the probable cause they had obtained prior to his arrest. Because the existence of probable cause is a "complete defense to an action for false arrest," Nelson's false arrest claim cannot be sustained. *Bernard*, 25 F.3d at 102.

## B.    Fourth Amendment:  Unreasonable Detention

Having determined that Nelson's arrest was supported by probable cause, I now address the argument that Nelson's subsequent, prolonged incarceration violated his Fourth Amendment rights. In short, the Amended Complaint can be read to assert that, after Nelson's arrest, defendants were obligated to conduct at least a minimal investigation into his claim of innocence, which Nelson argues would have exonerated him. Their failure to do so, this argument goes, "violated [Nelson's] right to be free from unreasonable detention . . . under the Fourth Amendment." Am. Compl., ¶ 24.

In *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), the Second Circuit found that the duty "to investigate specific, readily-verifiable claims of innocence in a reasonable time period" was violated when the exculpatory evidence – a videotape in the custody of the police which

conclusively established the defendant's innocence – was intentionally left unviewed by the police while defendant remained incarcerated for 217 days. *Id*. at 209. The Court relied on three factors to find such a violation: (1) the length of time of wrongful incarceration; (2) the "ease with which the evidence exculpating Russo . . . could have been checked;" and (3) the "alleged intentionality" of the officers' behavior. *Id*. In sum, the Court found that these facts demonstrated that the police officers' behavior "shock[ed] the conscience" – a requisite showing for this Fourth Amendment violation. *Id*. at 210.

I find that, considering the same factors as did the Second Circuit, defendants' conduct does not "shock the conscience." As an initial matter, even when viewing the facts in the light most favorable to Nelson, it cannot be said that the "ignored" evidence here was exculpatory. Nelson asserts that, "had defendants done a thorough and proper investigation into the complete information they had as to the identity of 'C'[,] they would have easily concluded that [Nelson] was not 'C.'" Pl.'s Mem. at 13. This conclusory statement stands in stark contrast to the facts in *Russo*, where a videotape undisputedly provided conclusive proof of Russo's innocence.[9] While Nelson does claim, in the Amended Complaint, that a "simple[] comparison between the person in the videotape and the plaintiff" would have shown "that the plaintiff was not present at the commission of the crimes," the facts suggest otherwise. First, defendants state that the videotape in question did not clearly capture C's likeness. Second, although Nelson claims that he was able to determine that the individual captured on video was not him, he admits that his previous attorney, after viewing the

---

[9] There, a tattoo-free perpetrator was captured on video while robbing a service station. At the time of his arrest, Russo had prominent tattoos on his forearms, hands, neck, and legs.

videotape, was unable to determine whether the individual was or was not Nelson.[10]  On these facts, it cannot be said that the videotape was exculpatory.

More importantly, the facts here do not support a finding of intentionality on the part of defendants.  Indeed, Nelson alleges that defendants *negligently* failed to confirm C's identity. Furthermore, the allegations of defendants' negligence pales in comparison to the conduct displayed by the police officers in *Russo*.  There, the officers not only refused to view the videotape, but affirmatively misrepresented to Russo that they had done so.  In an effort to obtain a confession, the officers falsely reported that the video showed a perpetrator with tattoos that matched Russo's. Russo also alleged that the officers willfully mishandled and suppressed the videotape by failing to turn it over to the prosecuting attorney which, in turn, prevented the prosecutor from complying with his duty to give the exculpatory evidence to the defense.  That the Second Circuit found this behavior to "shock the conscience" is not surprising.  The same cannot be said here.  Defendants had probable cause to arrest Nelson and had no reason to doubt the CI's identification after the arrest. In fact, once defendants were advised of Nelson's alleged alibi defense, they investigated it promptly.  Because defendants' conduct does not "shock the conscience," Nelson's unreasonable detention claim, under the Fourth Amendment, is rejected.

### C.       First Amendment

In his amended complaint, Nelson alleges that defendants "violated [his] right to free speech under the First Amendment."  Am. Compl., ¶ 23.   A plaintiff asserting a *Bivens* claim must allege

---

[10]  Nelson's current counsel explained, during oral argument, that he received the videotape during discovery.  The videotape was not, however, submitted to the court as an exhibit.  When questioned about the videotape's contents, Nelson's counsel argued that it is not his burden to show that the videotape is exculpatory.

specific facts to show that a defendant deprived a plaintiff of a clearly established constitutional right while acting with federal authority. *Bivens*, 403 U.S. at 389; *Siegert*, 500 U.S. at 226; *see also Alsaifullah v. Travis*, 160 F. Supp. 2d 417, 420 (E.D.N.Y. 2001). "Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). Additionally, a *Bivens* plaintiff must show that the defendant participated directly or was personally responsible for the actions which are alleged to have caused the constitutional deprivation. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).

Here, Nelson fails to set forth *any* factual basis for his allegation that defendants violated his First Amendment right to free speech. Because Nelson's First Amendment claim is conclusory in nature and fails to establish that defendants were directly or personally responsible for the alleged violation of his First Amendment rights, it is rejected.

## III. Qualified Immunity

Even if defendants committed the Fourth Amendment violations Nelson claims they did, they would be "entitled to qualified immunity if either (1) [their] actions did not violate clearly established law or (2) it was objectively reasonable for [them] to believe that [their] actions did not violate clearly established law." *Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007). The right to be free from arrest in the absence of probable cause was well established at the time Nelson was arrested. *See Soares v. State of Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993). So too was the right to be free from "prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which shocks the conscience." *Russo*, 479 F.3d at 211. Nonetheless, defendants are entitled to qualified immunity because it was "objectively reasonable" for them to believe that their acts did not violate the rights in question. *Moore*, 505 F.3d

at 208.

Where reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established rights, the immunity defense is available. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Cartier v. Lussier*, 955 F.2d 841, 846 (2d Cir. 1992). The main "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. at 202 (quoting *Malley*, 475 U.S. at 341).

Here, if defendants committed the Fourth Amendment violations, they would be entitled to the defense of qualified immunity. With regard to Nelson's false arrest claim, it was objectively reasonable for defendants to believe that probable cause existed for Nelson's arrest. As set forth in detail in Section II.A., *supra*, when viewing the facts in the light most favorable to Nelson, a reasonable officer in either Intrator or Chang's shoes could have believed that the CI's identification of Nelson – in addition to the other evidence discovered throughout defendants' investigation – established probable cause for Nelson's arrest. Similarly, with regard to Nelson's unreasonable detention claim, it was objectively reasonable that defendants did not further confirm C's identity after Nelson's arrest. Given the facts set forth in Section II.B., *supra*, an objectively reasonable officer in either defendant's shoes would not have believed he was legally required to engage in the multitude of investigatory techniques Nelson now, in hindsight, suggests would have exonerated him.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted.  The

Clerk of Court is directed to enter judgment for defendants.


                                                    **SO ORDERED.**


                                    _____/s_____
                                    **NINA GERSHON**
                                    **United States District Judge**


Dated:  Brooklyn, New York
            December 11, 2007